J-S56004-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| A.F. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| E.B.V. | : | No. 1708 EDA 2019 |

Appeal from the Order Entered May 24, 2019
In the Court of Common Pleas of Carbon County
Orphans' Court at No(s): No. 18-9056

BEFORE: PANELLA, P.J., OLSON, J., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.: **FILED FEBRUARY 12, 2020**

In this appeal, A.F. ("Father") challenges the decree entered in the Court of Common Pleas of Carbon County that denied his petition for involuntary termination of parental rights. He contends the trial court should have involuntarily terminated the parental rights of E.B.V. ("Mother") to their child, J.B.V., (born May 2015) (the "Minor Child" or "Child") due to her failure to perform parental duties. After careful review, we affirm the trial court's order denying Father's petition.[1]

The Minor Child was born in May 2015. Shortly after, Child experienced withdrawal symptoms due to Mother's drug use during pregnancy. Monroe

---

[1] Mother filed a motion to dismiss Father's appeal as wholly frivolous and vexatious. She also seeks an award of her attorney's fees pursuant to Pa.R.A.P. 2744. While we express our concern about Father's clearly meritless constitutional challenges, we decline to find that Father's challenge to the court's refusal to terminate Mother's parental rights wholly frivolous. We therefore deny Mother's motion to dismiss and her motion for sanctions.

County Children and Youth Services ("CYS") conducted an investigation into the circumstances of Child's birth and Mother's addiction. As a result, Child was placed in emergency shelter care.

The Monroe County Court of Common Pleas held an emergency shelter care hearing at which time Father appeared and expressed an interest in taking custody of Child. But, as of the hearing, Father was unable to establish paternity. The court ordered Father to undergo genetic testing. In the meantime, Child was maintained in emergency shelter care.

Thereafter, the court held a dependency hearing, during which Child was adjudicated a dependent child. The court reversed its decision soon after the results of Father's genetic testing established he was the presumptive father. As such, the court terminated Child's dependency status and awarded Father legal and physical custody. At all times up to and including the dependency hearings, Mother showed no interest in accepting parental responsibility for Child.

Even so, Mother's mother ("Maternal Grandmother") filed a custody action to obtain legal and physical custody of Child. A custody conciliation conference resulted in Maternal Grandmother receiving partial physical custody of Child. This arrangement required Father to present Child for visits with Maternal Grandmother on certain weekends and holidays. It was during these visits that Mother – now clean and sober - attempted to re-enter Child's life. Mother would appear during the visits and spend time with Child, unbeknownst to Father. Due to Mother's presence at these visits, Father filed

a petition for involuntary termination of Mother's parental rights, claiming she did nothing to provide for Child nor perform parental duties on his behalf.

As a resident of Carbon County, Father successfully transferred the case to the Carbon County Court of Common Pleas. After conducting an evidentiary hearing on the petition, the court entered a decree denying Father's requested relief. Father timely filed a notice of appeal and a concise statement of errors complained of on appeal. This appeal is properly before us.

On appeal, Father raises the following issues:

(1) Did the trial court err as a matter of law and thereby infringe [on] . . . [Father's] fundamental liberty interests protected by his due process and equal protection rights under the U.S. Constitution, amend. 14, § 1, and the Pennsylvania Constitution art. I, § 1 . . . [?]

(2) Did the trial court err as a matter of law when it concluded that . . . [Mother's] parental rights could not be terminated under any of the enumerated sections of 23 Pa. C.S.A. ?

(3) Did the trial court abuse its discretion by admitting evidence identifying the potential adoptive person?

(4) Did the trial court abuse its discretion in making specific factual findings and conclusions from the testimony presented?

Appellant's Brief, at 4-5.

We review these claims under our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse

- 3 -

of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act (the "Act"), 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In his first issue, Father challenges the constitutionality of the Act. He alleges that in order to terminate Mother's parental rights under the Act, he "must either (a) participate in an adoption . . . or (b) relinquish his parental rights." Appellant's Brief, at 21. Father asserts that conditioning the termination of Mother's parental rights upon either a pending adoption or voluntary relinquishment interferes with his fundamental right to raise Child.

*See id*., at 25. Furthermore, as there is no basis to impair his liberty interest, Father maintains that it is constitutionally repugnant to require marriage as a prerequisite to termination under the Act. *See id*., at 28. Therefore, Father contends the Act violates his due process and equal protection rights under the Fourteenth Amendment of the U.S. Constitution. *See id*., at 21.

Preliminarily, we must address an issue related to Father's challenge to the constitutionality of the Act. In Pennsylvania, when a party challenges the constitutionality of any statute, and the Commonwealth is not a party in the matter, the challenging party must notify the Pennsylvania Office of the Attorney General so that the Attorney General has the opportunity to be heard on the issue. *See In re J.Y.*, 754 A.2d 5, 11 (Pa. Super. 2000); *see also* Pa.R.C.P. 235. Failure to file such notice results in waiver of the claim. *See* Pa.R.A.P. 521 (a).

The record reveals that the Commonwealth is not a party in this matter, and Father failed to notify the Office of the Attorney General of his challenge to the constitutionality of the Act. Accordingly, we are constrained to find that Father has waived any constitutional claim. Therefore, we decline to address the merits of this claim.

In addition, based on our review of the trial court opinion and the applicable law, we conclude that the trial court properly disposes of the remaining issues raised by Father. Of particular note, we agree with the court that Father's "attempt [to terminate Mother's parental rights] . . . fails as the conditions which led to . . . [Child] being removed from . . . [Mother] no longer

- 5 -

exist and in fact ceased to exist when . . . [Father] was given custody . . . ." Trial Court Opinion, 5/24/19, at 17. Further, we cannot conclude, on this record, that it was error for the court to admit evidence regarding the proposed adoptive mother's identity. ***See id***., at 9-15. Having averred that adoption was contemplated, Father had an obligation to present testimony on this subject, which he did not. Finally, the record supports the court's determination that Mother demonstrated a serious intent to parent Child, as evinced by the performance of her parental duties. ***See id***., at 25.

Therefore, we affirm the order on the basis of the trial court opinion.

Order affirmed. Motion to dismiss denied. Motion for sanctions denied.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/12/20

- 6 -

IN THE COURT OF COMMON PLEAS OF CARBON COUNTY, PENNSYLVANIA
ORPHANS COURT DIVISION

2019 MAY 24 A 11: 17

██ ██,                           :
                                 :
            Plaintiff            :
                                 :
        Vs.                      :    No. 18-9056    RECEIVED
                                 :                   JUN 0 3 2019
██████████████,                  :
                                 :
            Defendant            :

Michael S. Greek, Esquire        Counsel for Plaintiff
Bernard Conway, Esquire          Counsel for Plaintiff
Joseph Sebelin, Jr., Esquire     Counsel for Defendant
Mark Combi, Esquire              Guardian Ad Litem

## MEMORANDUM OPINION

Matika, J. - May 24 , 2019

In this Opinion and accompanying Decree, this Court is tasked with determining whether or not the parental rights of a recovering addict, who surreptitiously visited with her subject child while that child was in the partial physical custody of his maternal grandmother, has exhibited sufficient efforts to maintain an appropriate position in this child's life and avoid the termination of her parental rights. For the reasons stated in this Memorandum Opinion, this Court is constrained to deny the Petition for Involuntary Termination of Parental Rights filed by the father, ████████.

## FACTUAL AND PROCEDURAL BACKGROUND

The Petitioner, ████████ (hereinafter "████") and the Respondent, ██████████████ (hereinafter "████")

[FM-10-19]

1

conceived a child, ██████████ (hereinafter "J.V.") who was born on May ██, 2015. At the time of his birth and prior thereto, ████████ was addicted to and had been using various controlled substances such as methamphetamine, heroin, suboxone, and xanax. As a result, J.V. was born addicted to opiates and suffered opiate withdrawal upon his birth. Consequently, Monroe County Children and Youth Services commenced an investigation into the circumstances surrounding J.V.'s birth and ████████'s addiction. As a result, on May 21, 2015, the Monroe County Children and Youth Services Agency took custody of J.V. and placed him into emergency shelter care.[1] On May 22, 2015, an emergency shelter care hearing was held at which time only ████████ appeared and expressed an interest in taking custody of J.V. and would participated in any genetic testing to establish if he was in fact J.V.'s father. Pending that testing, J.V. was maintained in emergency shelter care.[2]

On May 28, 2015, Monroe County Children and Youth Services learned that ████████ began suboxone treatment to address her addiction and had also provided a clean urine test. Despite this, she maintained that she did not want anything to do with J.V.

A dependency hearing was held on May 29, 2015. As of that

---

[1] During this investigation, ████████ named two possible fathers, one of whom was ████████; however since nothing was conclusive on the identity of the father, the Child was placed into emergency shelter care.

[2] Due to physical condition, J.V. remained in the hospital until June 8, 2015.

date, ████ had not received back any result from the paternity testing. Accordingly, J.V. was adjudicated a dependent child. On June 1, 2015, ████'s private genetic testing established that he was the presumptive father of J.V. On June 8, 2015, J.V. was discharged from the hospital and into ████'s custody. On July 13, 2015, the genetic testing ordered by the Court at the emergency shelter care proceeding confirmed that ████ was the presumptive father.

On September 10, 2015, a further hearing on the dependency status of J.V. was held. Based upon the testimony provided, the Master, Todd W. Weitzmann, Esquire, recommended that the child's dependency status be terminated and that legal and physical custody of J.V. be awarded to ████, with whom J.V. had been with since June 8, 2015. At all times, up to and including that hearing, ████ showed no interest in J.V.'s situation. J.V. has been in the physical and legal custody of his father.

At some time in the latter part of 2015, J.V.'s maternal grandmother, ████ ████ (hereinafter "Grandmother") commenced a custody action against both ████ and ████.[3] As a result of a custody conciliation conference which occurred on or about September 23, 2016, it was recommended that ████ be granted sole legal custody and primary physical custody, while Grandmother was

---

[3] Originally, Grandmother named Monroe County Children and Youth Services as a defendant as well, however, as per Order of Court dated October 13, 2016, they were removed as a defendant in that action.

to receive partial physical custody every second and fourth Saturdays from 9:00 A.M. until 5:00 P.M. Other periods of partial physical custody were also afforded Grandmother on certain holidays. This recommendation also suggested that "the partial physical custody rights of mother (█████) are hereby suspended until she files a petition with this court and attends a conciliation conference in the future."[4] In fact, throughout the entire calendar year 2016, █████ did not see or inquire about J.V. from █████.

Testimony presented by both █████ and Grandmother revealed that on most occasions in anticipation of Grandmother's periods of partial physical custody, █████ inquired of Grandmother whether █████ was going to be present. Up through the October 14, 2017 visit, Grandmother regularly responded to █████ and intimated that "Erica does not now, nor has she ever had any visit with Jamie." It was not until meeting with an attorney herself did Grandmother cease in including that sentence in e-mails responding to █████. It was around this time period when █████ began to appear at Grandmother's residence during her periods of partial physical custody with J.V. In fact, Grandmother's response was now, "As stated in Barry Cohen's[5] letter to you dated July 6, 2017,

---

[4] It was noted in the recommendation that █████ failed to appear for this conference and had not participated as a parent since J.V.'s birth.

[5] Barry Cohen, Esquire was Grandmother's counsel in the Monroe County custody case.

your inquiries about where Jamie will be and with whom during my shared custody are uncalled for and do not require answers."

At some point in 2017, ████, a resident of Albrightsville, Carbon County, sought and was successful in transferring the custody case to Carbon County. Thereafter on January 12, 2018, Grandmother filed a custody action seeking partial physical custody of J.V. here in Carbon County pursuant to a Monroe County Order. This action resulted in an Interim Order dated March 9, 2018 mirroring that which was issued by Monroe County on October 13, 2016, including language which required ████ to file a petition to reinstate[6] which ████ eventually did on April 17, 2018.[7]

From November, 2017 until at least the filing of the instant petition to terminate parental rights filed on February 13, 2018, ████ had been present at her Mother's home while Grandmother was exercising her partial physical custody rights in and to J.V. on the second and fourth Saturdays each month. She spent these times with J.V., unbeknownst to ████. One of the reasons she never told ████ that she was present was due to the hostilities between ████ and Grandmother. She acknowledged that she had a

---

[6] While the term "reinstate" and "suspended" were used in the March 9, 2018 and October 13, 2016 order respectively, this Court could not identify any evidence to indicate ████ had any custody of J.V. to actually "suspend."

[7] This filing was dismissed by Order of Court dated April 30, 2018 as a result of another Order of even date which granted ████'s preliminary objections to Grandmother's standing to pursue partial physical custody in the first instance.

substance abuse disorder most of her adult life but was clean and sober since May, 2017. She also testified that she had not gotten involved with J.V. and visiting him before November, 2017 nor contacting █████ because she did not feel five (5) months or so was sufficient enough time to re-engage with J.V. Further, until such time as she went with Grandmother to see Attorney Nicholas Masington, she believed that she would be breaking the law visiting with J.V. On cross-examine from █████'s Attorney, █████ admitted that she wanted more clean time under her belt before seeing J.V. because she felt that would be in his best interests. █████ also testified that, absent the Saturday visits while J.V. was visiting with Grandmother, she had done nothing else to provide for J.V. nor perform parental duties on his behalf.

The testimony presented and the exhibits offered and admitted did not prohibit █████ from seeing J.V. while he was in the custody of Grandmother.

When questioned on the issue of whether an adoption was contemplated, █████, despite the overruling of his counsel's objection to this testimony, provided vague and nominal testimony on this issue and specifically on the person who "contemplated" adopting J.V. should █████'s parental rights be terminated. All █████ testified to was the identity of his girlfriend who lived in New York. █████ also testified that he has been seeing her "on weekends" during the course of their one plus year long

[FM-10-19]

6

relationship. No testimony was presented by this person, nor on the issue of any relationship between this person (███████████) and J.V.

In the midst of contentious custody proceedings involving █████ and Grandmother, ████████ filed the instant petition. Hearings took place on September 21, 2018 and October 23, 2018. Proposed findings of fact and conclusions of law were filed by Counsel for ██████ and for ████████ as well as the Court appointed Guardian ad Litem for J.V.

This case is now ripe for an appropriate disposition.

## LEGAL DISCUSSION

████████ filed this petition for involuntary termination of the parental rights of the maternal mother, ████████ on February 13, 2018. At that time, ██████ alleged that ████████'s parental rights should be terminated pursuant to one of the several grounds outlined in the statute, to wit: 23 Pa. C.S.A. § 2511(a)(1)(6) and (8).[8] These grounds alleged by ████████ are as follows:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

[8] After a long and somewhat confusing discussion at the hearing on September 21, 2018, it was determined that ████████, despite initially claiming other grounds as a basis for terminating ████████'s parental rights to J.V., ultimately agreed that only these three sections would be the grounds upon which he would present his case for termination.

(6)   In the case of a newborn child, the parent knows or has reason to know of the child's birth, does not reside with the child, has not married the child's other parent, has failed for a period of four months immediately preceding the filing of the petition to make reasonable efforts to maintain substantial and continuing contact with the child and has failed during the same four-month period to provide substantial financial support for the child.

. . .

(8)   The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

In order to properly adjudicate ███████'s claims on each of these grounds, this Court will address each separately noting that ██████ only needs to establish one such grounds by clear and convincing evidence in order to succeed on his petition. *In Re: B.L.W.*, 843 A.2d 380, 384 (Pa. Super. Ct. 2004) (*en banc*); *In Re: T.R.*, 465 A.2d 642 (Pa. 1983). Such clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-04 (Pa. 1989).

In a termination proceeding, "the initial focus is on the conduct of the parent whose rights are at issue." *In Re: E.M.I.*, 57 A.3d 1278, 1287 (Pa. Super. Ct. 2012). Should ██████ succeed on this first prong under any of the alleged grounds identified

above, the Court must also analyze the needs and welfare of the child as this is the second prong of the termination test. *In Re: A.P.*, 994 A.2d 1108, 1121 (Pa. Super. Ct. 2010). This includes determining whether termination would best serve the developmental, physical and emotional needs and welfare of the child while examining such tangibles as "love, comfort, security, and stability." *In Re: E.M.I.*, Supra at 1287 (internal citations omitted).

Additionally, in *In re: E.M.I.*, the court stated,

"current case law indicates that while an averment of a contemplated adoption might be sufficient to obtain a hearing on the termination petition, at the termination hearing the petitioning parent must demonstrate the planned adoption is also in the child's best interests, before the court will terminate the parental rights of the responding parent. *See In re Adoption of L.J.B.*, supra at 232, 18 A.3d at 1110-11 (implying no gain to child or society is achieved by terminating one parent's rights to permit adoption by another who is unwilling or unqualified to adopt). Thus, as part of its Section 2511(b) analysis of the needs and welfare of the child in this context, the court must address and evaluate the "proposed adoption" that was averred n the termination petition.

*Supra* at 1287.

In this case, █████ claims that he has averred in his petition in paragraph 9 that an adoption is presently contemplated and that this simple averment is sufficient to show that a proposed adoption is in the best interests of J.V. without inquiring into the person who would actually be in a position to adopt the child should █████'s parental rights be terminated. At the hearing,

counsel for ████, while cross-examining ████, inquired of the proposed adoptive mother should termination be granted. This line of questioning was met with an objection by ████'s counsel who argued that 23 Pa. C.S.A. §2504.1 which reads: "The Court shall take such steps as are reasonably necessary to assure that the identity of the adoptive parent or parents is not disclosed without their consent in any proceeding under this subchapter or Subchapter B (relating to involuntary termination)". and "the Supreme Court may prescribe uniform rules under this section relating to such confidentiality", prohibits the identity of the proposed adoptive mother without her consent. Further, ████ argues that since 23 Pa.C.S.A. §2531 (report of intention to adopt) is equally inapplicable, disclosure is likewise not appropriate. ████ accurately cites to subsection (c) of this statute which indicates that "no report shall be required when the child is the child, grandchild, stepchild, brother, or sister of the whole or half blood, or niece or nephew by blood, marriage or adoption of the person receiving or retaining custody or physical care." However, his reliance on the subsection as the means to preclude questions as to the identity, relationship, and possible character of the proposed adoptive mother is misplaced. Accordingly, ████'s objection into this specific line of questioning was overruled and

counsel for ██████ was permitted to inquire regarding the proposed adoptive mother.[9]

During direct examination, ██████ never even mentioned that an adoption was contemplated nor who that person might be. On cross-examination by ██████'s counsel, over the objection of ██████'s counsel, the following colloquoy took place:

Q. You may answer the question, Mr. ██████.

A. And that question again?

Q. Who is the person who is adopting? You don't have to adopt the child. Is there another person that's contemplated in this termination?

[9] "A termination of parental rights petition filed by one parent against the other must occur in the context of an anticipated adoption." *In Re: Adoption of M.R.D.*, 145 A.3d 1117, 1120 (2016). In those cases, not only must the parent establish the requirements set forth in 23 Pa. C.S.A. §2517, but also that the proposed adoptive mother is authorized to adopt the subject child pursuant to the Adoption Act. 23 Pa. C.S.A. §2512(b); *In Re: M.R.D., Supra.* Further, the court stated that the Adoption Act explicitly allows only a stepparent to be an adoptive resource for the subject child when it is a biological parent filing the termination petition against the other biological parent. *See* 23 Pa. C.S.A. §2903. If the proposed adoptive parent is someone other than a stepparent, the Adoption Act requires the biological parent who is filing the termination petition to relinquish his parental rights. Id. These requirements, however, can be waived "for good cause shown." *See* 23 Pa. C.S.A. §2901.

In *In re.T.R.*, 465 A.2d 642, 644 n.10 (Pa. 1983), the Supreme Court observed that, "the 'singular concern' of the Adoption Act" is to "establish a new 'parent-child relationship.'" Accordingly, it reasoned that the trial court is required to "consider, and not merely accept on its face," the putative adoption parent's declaration of intent to adopt in order to confirm that the purpose of the involuntary termination of parental rights is genuine, i.e., to establish a new parent-child relationship.

As it relates to the "contemplated adoption" as averred by ██████, the Court must also examine the record to ascertain whether the proposed adoption of J.V. by the proposed adoptive mother is to establish a new family unit. Accordingly, the Court is required to analyze the integrity of the proposed adoption and whether the adoption was likely to happen. *See In re T.R.*, 465 A.2d 642, 644 n.10 (1983).

A. Yes, there is.

Q. And what is the name of that person?

The Witness: Your Honor, may I speak on behalf of my Counsel?

The Court: No.  Your Counsel speaks on behalf of your Counsel. You answer questions presented by Counsel when asked.

The Witness: ███████████.

By Mr. Sebelin:

Q. And who is ████████?

A. ████████ is my girlfriend.

Q. How long have you been together?

A. Over a year.

Q. Okay. Does she live with the child?

A. Not at this time.

Q. Where does she live?

A. In New York.

Q. New York State?

A. The state of New York.

Q. Where in New York? It is a big state.

A. Long Island.

Q. How frequently are the two of you together?

A. On weekends.

The Court: Could you spell her last name?

The Witness: ████████.

By Mr. Sebelin:

Q. ███ ███ hasn't filed a consent to adopt the child, correct?

A. That's correct.

Q. You and ██████ are not married, correct? I know you said it is your girlfriend. You are not married, correct?

A. That is correct.

Q. What does the child call ██████?

A. ██████.

Q. How many times - you said on the weekends and you have been dating a year? So -

At that point, ██████'s counsel objected, claiming it was not necessary to further inquire into what was otherwise an area of inquiry he should have delved into on the issue presented above. In other words, ██████'s counsel did not want ██████'s counsel to ask any further questions of ██████ on an issue ██████ had an obligation to present testimony on in the first instance.[10] Further, nowhere on re-direct was ██████ asked any further questions into the proposed adoptive mother.

It is necessary to address this testimony for two reasons: 1) to determine whether to strike this testimony at ██████'s request

[10] As the Court did not believe it was ██████'s obligation to present this testimony but rather ██████'s obligation and since ██████ apparently did not want any evidence presented to satisfy his burden, this Court granted ██████'s request to cease inquiry.

as violative of 23 Pa. C.S.A. §2504.1; and 2) in furtherance of the analysis required on this issue of a contemplated adoption/new parent-child relationship *vis-à-vis* the integrity of the proposed adoption. Since the Court believes it is truly necessary to analyze the person, character and involvement of the proposed adoptive mother, in addressing ███████'s objections and request to strike that portion of ███████'s testimony the phrase "be careful what you wish for" comes to mind. Should the Court strike this testimony, this Court would have no evidence before it to address the integrity of the proposed adoption.[11] All that the Court would have before it is the single averment that, "an adoption was contemplated." In the case of *In re T.R.*, *Supra*, the court determined that it should not merely accept the "adoption as contemplated" averment on its face, but must actually consider adoptive parent's intent to adopt. Here, the proposed adoptive mother, was never called to testify. In fact, the only evidence established about her was her name (███████████), the length of the relationship ███████ had with her (over a year), the fact that she does not live with ███████ or the child (lives in Long Island, New York), the frequency of their contact (on weekends), that ███████ is not married to █████████, that the child calls her ███████ and that █████████ has not filed a consent to adopt the child. This

---

[11] Perhaps it was the intent of ███████ to avoid presenting this evidence knowing full well such evidence was unsubstantial *vis-à-vis* this issue.

testimony, limited by the sustained objection of ███████'s counsel, is unconvincing to the Court that any relationship exists between the child and ███████ and that an adoption was truly contemplated. Further, and as a result, it cannot be said that adoption would foster the creation of a new family unit[12] nor serve the best interest of the child.[13]

23 Pa. C.S.A. §2511(a) claims

Notwithstanding the fact that ███████ has failed to establish an appropriate "contemplated adoption," the Court feels obligated to address also the 2511(a) claims he raised in his petition. As

---

[12] In addition to the lack of evidence to establish an appropriately characterized "contemplated adoption," the Court also would be otherwise constrained to find that the relationship between ███████ and ███████, a boyfriend/girlfriend relationship, is not one contemplated by the statute to form a new "family unit."

[13] As duly noted by the Superior Court in *In re E.M.I.*, 57 A.3d 1278, 1290 (Pa. Super. 2012),"

> [a]s the petitioner, it was incumbent upon Mother to present adequate evidence in support of the petition. Mother must now bear the responsibility for any complaint that the court issued a decision on an incomplete record, as it was her burden to offer unequivocal factual support for S.S.'s potential adoption of Child. Although the hearings contained ample testimony on Father's parenting deficiencies, there was a noticeable absence of solid facts about the "contemplated adoption" element required under the Adoption Act and how the "proposed adoption" would foster a new family unit in Child's best interests. Quite simply, Mother did not carry her evidentiary burden. Contrary to the contention of Child's GAL, the court had no duty to require S.S. to file an intention to adopt or otherwise expand the record. Ultimately, the court correctly centered its analysis on the primary goals of the Adoption Act – the best interests of Child and the creation of a new family unit through adoption. On this record, we cannot fault the court's decision to deny Mother's petition to terminate Father's parental rights to Child."

While the Petitioner in the *E.M.I* case presented more than that presented by ███████ in the case *subjudice*, it, like here, failed to meet petitioner's burden.

he has raised three (3) separate claims, (a)(1), (a)(6) and (a)(8), we will address each seriatim.

I. §2511(a)(8) – Monroe County Children & Youth Involvement

██████ first contends that ███████'s parental rights should be terminated pursuant to 2511 (a)(8) of the statute. This subsection reads as follows:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date or removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child."

This Court agrees that J.V. was removed from his mother by the Monroe County Office of Children and Youth Services (hereinafter "Agency") because of ████████'s drug use, and placed into Emergency Shelter Care and that pending ███████ s confirmation as J.V.'s father, was the subject of a dependency petition in which the Agency alleged that J.V. was "without proper parental care of control." Once ████████ was able to establish himself as the Father, the Monroe County Courts, upon the recommendation of the Master, Todd W. Weitzman, Esquire, terminated placement through the Agency finding that the circumstances which necessitated the dependency adjudication have been alleviated." Thereafter and as a result, on September 17, 2015, J.V. was released from the Agency's custody and placed with ████████ .

This Court first finds that (a)(8) is one of the subsections of the statute utilized by Children and Youth Agencies to terminate parental rights of parents, and not utilized by a biological parent who has custody of the subject child, and is when seeking to terminate the other biological parent's rights to that child as is the case here. Secondly, even if applicable to "private termination proceedings", ██████'s attempt under this subsection fails as the conditions which led to J.V. being removed from ██████ no longer exist and in fact ceased to exist when ██████ was given custody on September 17, 2015. Therefore, ██████ would fail to terminate ██████'s parental rights under 23 Pa. C.S.A. §2511(a)(8).

II.  2511(a)(6) - Newborn Child

██████ further alleges in his petition that ██████'s parental rights should be terminated pursuant to (a)(6) of the statute which reads:

> In the case of a newborn child, the parent knows or has reason to know of the child's birth, does not reside with the child, has not married the child's other parent, has failed for a period of four months immediately preceding the filing of the petition to make reasonable efforts to maintain substantial and continuing contact with the child and has failed during the same four-month period to provide substantial financial support for the child." (Emphasis ours)

Without getting into the specific evidence presented at the hearing by ██████ on this claim, we can end the analysis by simply addressing the fact the J.V. is not a newborn child, nor was he on

the date of the filing of this petition.[14] Pursuant to 23 Pa. C.S.
A. §2102, a newborn child is defined as "[A] child who is six
months of age or younger at the time of the filing of any petition
pursuant to chapter 25 (relating to proceedings prior to petition
to adopt)." Since J.V. was approximately thirty-three months old
at the time of the filing of the instant petition, 2511(a)(6) is
inapplicable.

   III. 2511(a)(1)- Settled Purpose to Relinquish Rights/Failed or
        Refused to Perform Parental Rights

   The remaining subsection of the statute which ████ believed
entitles him to terminate ████'s parental rights is 23 Pa.
C.S.A. §2511(a)(1). This section reads as follows:

> "the parent by conduct continuing for a period of at least
> six months preceding the filing of the petition either has
> evidenced a settled purpose of relinquishing parental claim
> to a child or has refused or failed to perform parental
> duties."

23 Pa. C.S.A. §2511(a).

   Under this subsection, ████ may prove his claims in one of
two different ways: 1) that ████ has, for at least six months
prior to the filing of the instant petition, conducted herself in
such a way that she has shown that she wants to relinquish her
parental rights to J.V.; or 2) that ████ has for at least six
(6)months prior to the filing of the instant petition, refused or
failed to perform parental duties for and on behalf of J.V. Thus,

---

[14] J.V. was born on May 19, 2015. ████'s petition was filed on February 13,
2018.

the minimal operative time frame within which to examine ████'s conduct *vis-à-vis* J.V. is six months prior to February 13, 2018. In other words, the Court is to examine what did ████ do or not do from August 13, 2017 until February 13, 2018 to warrant the possible termination of her parental rights in and to J.V.

There was sufficient testimony presented by ████ that during the course of a custody action involving J.V.'s maternal grandmother, ████ ████, he expressed concern about whether the biological mother was to have or had any contact with J.V. during maternal grandmother's periods of partial physical custody of the subject child. ████'s testimony regarding the numerous conversations with or emails to and from maternal grandmother on the issue of whether ████ was present suggested that he was infatuated with ensuring that ████ played no role in the child's life.

████ herself testified that at the time of J.V.'s birth she wanted nothing to do with him and instantly thought that adoption may be the best for him. ████ also testified that she did not see J.V. at all throughout the remainder of 2015 nor at all in 2016 and that it was not until late 2017 that she started to visit with J.V. when her mother had partial physical custody of J.V. When asked why she had not spoken to ████ during this time frame, she intimated that it was due to the hostility he had shown to the maternal grandmother regarding her periods of partial

[FM-10-19]
19

physical custody and, not wanting to jeopardize that, was afraid to contact him.

██████ further testified that she had a serious substance use disorder for the majority of her adult life. In fact, J.V. was born with illegal substances in his system due to ██████'s addiction. ██████ testified that she was sober for five (5) months after J.V.'s birth but relapsed and got in trouble in January, 2017. ██████ testified that in May 2018, she had reached one year of sobriety. When asked why she had not sought time with J.V. once she became sober, she testified that she did not feel as if she had enough clean time to prove to anyone she was a fit parent. It was only after November, 2017 did she feel she wanted to become a bigger part of J.V.'s life when she would appear at her mother's house when J.V. was visiting there.

██████ testified that she saw J.V. at her mother's home from November 2017 to February 13, 2018 approximately eight to ten times. During these visits, ██████ stated that she would play with J.V., color with him, draw with him, and read to him. Also during this time frame, she began to reach out to an attorney to see if there was anything she could do to restore the custodial rights that were suspended per the Order of Court dated October 13, 2016. ██████ admitted that, other than these visits, which occurred without ██████ knowing about them and her attempt to have her custodial rights reinstated, she did nothing more in the way

of financial or emotional support for J.V. Bottom line, ██████ felt that, while she considered herself an "unfit" parent, she did not want to be involved in J.V.'s life. When she felt the time was right, she began to reappear in J.V.'s life albeit through secret visits while J.V. was at his maternal grandmother's home.

. ██████ also testified that he felt ██████'s issues of drug use and homelessness were the two primary causes for concern and reasons he was seeking termination of her parental rights in addition to his belief that J.V. deserved a parent who is fit and willing to provide emotional, mental and physical support for this child, and that ██████ was not that person.

A.    Relinquishing Parental Claims

██████ argues that ██████ relinquished her rights to J.V. from the time she gave up custody of him at birth. This Court agrees with ██████ insofar as his analysis of ██████'s conduct for the better part of two years (birth through approximately November, 2017). However, thereafter, albeit surreptitiously, ██████'s conduct insofar as wanting to be involved in J.V.'s life can no longer equate to contact tantamount to relinquishing her parental rights to him which occurred within the six (6) month period prior to ██████'s filing.

██████ also argues that even if ██████ did see J.V. during this six month period, she did so in violation of the October 13, 2016 custody order and she should not be "rewarded" for this

illegal and improper conduct in ignoring the Court's concerns that resulted in ████████'s custodial rights being suspended. However, in reviewing the recommendation which led to the issuance of the October 13, 2016 custody order, this Court finds nothing that prohibits ████████ from "having contact" with J.V. just that her specified periods of partial physical custody were suspended pending the filing of a petition by her. While we can presume ████████ raised the issue of ████████'s substance use disorder, there is nothing in the recommendation nor order suggesting that ████████ have no contact with J.V. pending the filing of a petition. Further, there is nothing in the record to suggest that ████████ was in fact in contempt of court for having contact with J.V. Therefore, we do not see these efforts by ████████ to reengage with her son as violative in any way of the court order, but rather evidence of her conduct not to relinquish her rights to her child.

B.   Refuse/Fail to Perform Parental Duties

This aspect of the termination statute is the most difficult one to analyze. Under the circumstances of this case the question here is whether or not ████████, by her conduct from August, 2017 through February, 2018 shows evidence of a refusal or failure to perform parental duties *vis-à-vis* J.V. There is undisputed evidence that ████████ did in fact have contact with J.V. from November, 2017 through the end of January, 2018, while J.V. was visiting with his grandmother. The testimony was also undisputed

that ███████ was performing "some" type of parental duties with J.V. in her interactions with him. Additionally, there was testimony that ███████ wanted to do more with regard to her relationship with J.V. beyond these periodic visits when she reached out to an attorney to see what to do regarding her conduct and custodial rights. The question now becomes was this enough on the part of ███████ to establish that she had not failed/refused to perform these parental duties.

In the case of *In Re: B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), the court stated:

> "There is not simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not

[FM-10-19]

23

preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs."

(internal citations omitted)

Undoubtedly, ████████'s contact with J.V. during the six (6) month period were limited to when he was with his maternal grandmother. Additionally, taking into consideration the fact that she had not been involved in the child's life for a significant period of time, her attempts to re-establish her relationship with him needed to start small . . . baby steps, so to speak. What she began to do before the petition to terminate was filed was a re-introduction of herself into J.V.'s life, albeit without ████████'s knowledge. The fact that she took the time to address her addiction to better herself internally as well as externally was progress towards vindication *vis-à-vis* her abandonment of J.V. until such time as she believed it to be in J.V.'s best interests.

> "To be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question." *In Re: D.J.S.*, 737 A.2d 283, 286 (Pa. Super. Ct. 1999(quoting *In Re: Adoption of Hamilton*, 549 A.2d 1291, 1295 (1988)).

As occurs most times in custody cases, absentee parents are slowly re-introduced into children's lives. Such were the steps taken by ███████ to begin the process of re-establishing her parental responsibilities towards J.V.

In conclusion, this Court does not feel that ███████ has failed nor refused to perform parental duties on behalf of J.V. during the six (6) month period called for in the statute. To the contrary, this Court finds that ███████ has demonstrated a serious intent, desire, and willingness to take on the role of parent.

Section 2511(b) Analysis

In light of the fact that this Court has determined ███████ has failed to satisfy the statutory grounds for terminating ███████'s parental rights in and to J.V., it is not necessary to engage in a discussion regarding the "needs analysis" under 2511(b), that being or giving "primary consideration to the developmental, physical and emotional needs and welfare of the child." However, if pressed to do so, the conduct of ███████ in rekindling and recultivating a relationship with J.V. at a time where his only other relationship was with his biological father, in the eyes of this Court is the attempt at providing what this child needs. "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of

permanently severing any such bond." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. Ct. 2007) (citations omitted).

This Court believes that ██████'s actions are truly attempts to establish the emotional bond between parent and child, one that was lacking due to mother's addiction and one that should not be severed at the whim of the father.

## CONCLUSION

Based upon an exhaustive review of the record and the applicable case law, this Court does not find that ██████ has satisfied his burden in regards to his petition to terminate the parental rights of ██████ in and to J.V. and accordingly, enters the following order: